IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BCOWW HOLDINGS, LLC, BCOWW OUTFITTERS, LLC, | § § § | |
| *Plaintiffs* | § § | SA-17-CA-00379-FB |
| vs. | § § § | |
| DANIEL COLLINS, JADAC LLC, | § § | |
| *Defendants* | § § § § | |

# REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns the request for a preliminary injunction filed by Plaintiffs BCOWW, LLC and BCOWW Outfitters, LLC (collectively, "Plaintiffs" or "BCOWW") against Defendants Daniel Collins and JADAC, LLC ("JADAC") (collectively, "Defendants"). All pretrial matters in this case have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#9].[1] The undersigned has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (authorizing a U.S. Magistrate Judge to conduct an evidentiary hearing and submit proposed findings of fact and recommendations to a district judge on a motion for injunctive relief); *see also* Local Rule CV-72 ("The magistrate judges of this court are authorized to perform all the duties allowed to magistrate judges under the Federal Magistrates Act as amended in 28 United

---

[1] This case was initially referred to U.S. Magistrate Judge John W. Primomo but was subsequently referred to the undersigned in light of Judge Primomo's expected retirement [#37, #39].

States Code § 636).  This Court has subject matter jurisdiction over this matter under 28 U.S.C. §

1331 because Plaintiffs raise a federal question by asserting a violation of 15 U.S.C. § 1125(a).[2]

Accordingly the Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to

28 U.S.C. § 1367.

The undersigned held a hearing on Plaintiffs' request for preliminary injunction on

August 28, 2017 and August 29, 2017.  After considering Plaintiffs' brief [#2-3], Plaintiffs'

supplemental brief in support of their request for a preliminary injunction [#43-2], Plaintiffs'

post-hearing brief [#51], the response and supplemental response in opposition to the request

filed by Defendants [#35, #42], the testimony and other evidence presented during and in

advance of the hearing, the arguments of counsel, and the case file, the undersigned recommends

that the District Court **DENY** Plaintiffs' request for preliminary injunction.

## I.       PROCEDURAL BACKGROUND

This is an unfair competition case brought by Plaintiffs against a former member

Defendant Daniel Collins, as well as Defendant JADAC, a company Collins formed after

resigning from BCOWW.  Plaintiffs filed suit against Defendants on May 1, 2017, asserting

claims for breach of contract, trademark infringement, trade secret misappropriation, breach of

fiduciary duty, tortious interference with prospective business relationships, tortious interference

with existing contracts, common law unfair competition, and civil conspiracy [#1].  At the same

---

[2] Plaintiffs have also alleged diversity jurisdiction pursuant to 28 U.S.C. § 1332, asserting that
BCOWW Holdings, LLC and BCOWW Outfitters, LLC are companies organized under the laws
of the State of Texas with principal places of business in Texas, while Defendants are citizens of
Ohio, and the amount in dispute exceeds $75,000.  (*See* Verif. Compl. ¶ 5.)  However, a limited
liability company is not treated as a corporation for purposes of diversity jurisdiction.  Rather,
the citizenship of a limited liability company is determined by the citizenship of all of its
members.  *See Harvey v. Grey Wolf Drilling Co*., 542 F.3d 1077, 1080 (5th Cir. 2008).  From the
testimony at the hearing, it does appear that all current members of BCOWW are Texas citizens
and that Collins and JDAC are citizens of Ohio.  Federal jurisdiction exists regardless.

time they filed their Complaint, Plaintiffs filed a motion requesting a temporary restraining order, expedited discovery, and preliminary injunction [#2]. Construing the motion for temporary restraining order as a motion for preservation of evidence, the District Court granted the request [#8] and referred all pre-trial matters to the U.S. Magistrate Judge [#9]. The case was then stayed for mediation pursuant to a mandatory mediation provision in the Restated Company Agreement [#19, #21]. The stay was lifted on July 12, 2017 when the mediation ended in impasse, and the case was re-referred [#26]. U.S. Magistrate Judge John Primomo then set a hearing on Plaintiffs' request for preliminary injunction, and the parties subsequently conducted expedited discovery [#29, #32]. On August 22, 2017, the case was reassigned to the undersigned, who held a two-day hearing beginning on August 28, 2017.

## II.     LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the status quo by preventing irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. *Mississippi Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618, 627 (5th Cir. 1985); *Nichols v. Alcatel USA, Inc*., 532 F.3d 364, 372 (5th Cir. 2008). A party seeking a preliminary injunction must establish the following factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not disserve the public interest. *Mississippi Power,* 760 F.2d at 621; *Nichols*, 532 F.3d at 371.

"A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Mississippi Power,* 760 F.2d at 621; *Nichols,* 532 F.3d at 372 (internal quotations and citation omitted).

Accordingly, a preliminary injunction must be denied where the movant has failed sufficiently to establish *any one* of these four criteria. *Black Fire Fighters Ass'n v. City of Dall*., 905 F.2d 63, 65 (5th Cir. 1990) (emphasis in original). Only if a movant demonstrates a likelihood of success on the merits must the Court analyze the threat of irreparable harm or weigh the relative hardships. *See State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power,* 760 F.2d at 621.

To show a substantial likelihood of success, a movant must present a prima facie case, but need not prove that he is entitled to summary judgment. *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C*., 710 F.3d 579, 582 (5th Cir. 2013). Courts look to the standards of substantive law when determining whether this element has been met. *Miss Power*, 760 F.2d at 622.

Once a movant establishes a substantial likelihood success on its claim, the Court evaluates whether a substantial threat of irreparable harm exists if the injunction is not granted. To meet this factor, a plaintiff must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,* 804 F.2d 1390, 1394 (5th Cir. 1986). But "[t]he purpose of an injunction is to prevent *future* violations." *United States v. W. T. Grant Co*., 345 U.S. 629, 633 (1953) (emphasis added). Where a movant requests injunctive relief on the basis of a defendant's past violations, "the ultimate test . . . is whether [the] defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Sec. & Exch. Comm'n v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978); *see also Armstrong v. Turner Indus., Inc*., 141 F.3d 554, 563 (5th Cir. 1998) ("[t]o pursue an injunction . . . the [plaintiffs]

must allege a likelihood of future violations of their rights by [the defendant], not simply future effects from past violations."). This is because "[i]njunctive relief is not to punish for past violations, but to prevent future violations." *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 670 (5th Cir. 1968).

A trial court generally holds an evidentiary hearing on a request for preliminary injunction to resolve factual disputes apparent from the parties' conflicting evidence. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996); *see also Heil Trailer Int'l. Co. v. Kula*, 542 Fed. App'x 329, 334 (5th Cir. 2013). At this hearing, "the procedures in the district court are less formal, and the trial court may rely on otherwise inadmissible evidence, including hearsay evidence." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993). As with all other evidentiary hearings, a trial court weighs the evidence and may make credibility findings. *See United States v. Edwards*, 333 F.2d 575, 578 (5th Cir. 1964). "Although the district court may employ informal procedures and rely on generally inadmissible evidence [at the preliminary injunction stage], the record must nevertheless support the district court's decision." *Sierra Club*, 992 F.2d at 551 (citing Fed. R. Civ. P. 52).

### III. FINDINGS OF FACT

During the hearing, Plaintiffs called the following witnesses: Lizabeth "Libby" Williams, Daniel Collins (through his video-taped deposition), John Williams, and Osborn Barrett. Plaintiffs also offered Collins's deposition transcript (Exhibit 1), Deposition Exhibits 1- 50[3], and Exhibits 2-37, 51-53, which the undersigned admitted.[4] Defendants recalled Daniel Collins

---

[3] Deposition exhibits 13 through 16 consist of pictures of various waffle makers, produced either by BCOWW or JADAC. At the hearing, Plaintiffs also introduced into evidence and produced for the Court's inspection the physical waffle makers that correspond to each picture.

[4] For the hearing, Plaintiffs labeled Collins's deposition as "Exhibit 1," but used the same labeling ("Exhibit #") for their deposition exhibits. Plaintiffs also introduced additional hearing

(live) and John Williams, and offered Exhibits 1-23, which the undersigned admitted. The undersigned makes the following factual findings, based upon this evidence.

A. Formation of BCOWW

1.     BCOWW is a company formed by members John Williams, his wife Libby Williams, Osborn Barrett, and John Williams's childhood friend, Defendant Collins, on or about January 1, 2007. (*See* Restated Company Agreement, Collins Dep. Ex. 4). Collins and Barrett were both BCOWW Vice Presidents. (*See* Collins Dep. Ex. 3; Collins testimony).

2.     The original purpose of BCOWW was to source goods in China that would be brought to the United States and resold at a profit. (*See* Ver. Compl. [#1] ¶ 8; *see also* Libby William and John Williams testimony.)

3.     Pursuant to BCOWW's Restated Company Agreement, all members were required to "bring all investment or business opportunities to the Company" that they became aware of and "which are within the scope of the purposes of the company." (Restated Company Agreement ¶ 11.8). Members also acknowledged in the Agreement that "from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company." (*Id.* ¶ 12.12). Accordingly, each member agreed to "hold in strict confidence any information received regarding the Company that is identified as being confidential" and not to disclose it to any non-member except to "advisers or representatives of the member . . . but only if the recipients have agreed to be bound by the provisions of [the Agreement]." (*Id.*) The Restated Company Agreement was executed by all of BCOWW's founding members. (*Id.*)

---

exhibits using this same numbering scheme. For purposes of this report and recommendation, deposition exhibits shall be referred to as follows "Collins Dep. Ex.___," while all other exhibits submitted by Plaintiffs shall be referred to as "Pl. Ex.___."

4.     In forming BCOWW, John Williams, Libby Williams, and Barrett each invested capital in the Company, and received Class A stock for their investment.  (*See* Schedule A to Restated Company Agreement; *see also* John and Libby Williams testimony)  Collins, on the other hand, received Class B stock for his investment of time and prior experience in developing and sourcing products overseas.  (*See* Schedule A to Restated Company Agreement; *see also* John and Libby Williams testimony).

B.     The Employment Agreements

5.     Shortly after the company's formation, BCOWW requested that an attorney prepare employment agreements for the members/employees to sign.  (*See* Libby Williams testimony).  The attorney, Larry Berkman, did, in fact, draft an agreement, which imposes non-disclosure, non-solicitation, and non-compete obligations on BCOWW employees.  (*Id.; see also* Collins Dep. Ex. 5).  John Williams, Libby Williams, and Osborn Barrett all testified that they signed their agreements, although none was able to produce an executed copy of the agreement he or she executed.

6.     Collins admits that he received the draft agreement from the attorney.  Collins, however, vehemently denies that he ever executed an agreement.  In fact, he was able to produce the original letter from the attorney's firm enclosing the agreement and requesting that he sign it and return it in the enclosed envelope.  (*See* Def. Ex. 21).  The original, unexecuted employment agreement was transmitted by Berkman's secretary on bonded paper to Collins on or about April 13, 2007.  In the cover letter, which is also printed on bonded paper and signed in blue ink, Berkman's secretary requested that Collins sign the agreement, forward the original to John Williams "so that it will be fully executed," and transmit a copy to Berkman in the self-addressed enclosed envelope.  (*See id.*).  Berkman, like BCOWW, does not have an executed copy of

Collins's employment agreements in his records—presumably because Collins never returned the envelope as requested. Collins testified that he did not sign the agreement because he thought it would prevent him from being able to make a living. Collins's claim that he never signed the employment agreement is corroborated by Defendants' Exhibit 21 as well as by the fact Plaintiffs have been able to produce an executed version.

7. Despite this evidence, BCOWW claims Collins executed the employment agreement. (*See* Ver. Compl. ¶ 10; Ex. B to Verif. Compl.; Libby and John Williams testimony). BCOWW has accused Collins of stealing a folder allegedly containing the signature pages of employment agreements executed by each BCOWW member when Collins lived with the Williamses. (*See* Ver. Compl. ¶¶ 27-30; *see also* Libby Williams testimony). BCOWW makes this accusation without any proof except that Collins had access to the office where company documents were stored while he lived with John and Libby Williams.[5]

8. During the hearing, Libby Williams testified that she recalled seeing the executed signature page[6] to Collins's employment agreement in the pocket of BCOWW's binder at some point approximately two to three years ago. Notably, this would have been years *after* Collins resided with the Williamses, and therefore this testimony is inconsistent with BCOWW's accusation that Collins stole the documents when he lived with the Williamses. Similarly, John Williams testified that he, too, recalled seeing a copy of Collins's signature page in the BCOWW

---

[5] The undersigned notes that this accusation runs dangerously close to running afoul of Rule 11's prohibition of including allegations without having a reasonable basis to support them.

[6] Libby and John Williams testified that BCOWW only retained the signature page for each employment agreement because the agreements were all identical. However, this is contradicted by the evidence. Each draft employment agreement apparently included the applicable member's name in a footer, the member's position with BCOWW, and the member's address for notice purposes—all provisions that would have varied among the BCOWW's members. (*Compare* Pl Ex. 5 *with* Def. Ex. 21). It makes little sense that BCOWW would not have preserved the entire executed agreement for each of its members.

binder, and he is "positive" that the notebook contained Collins's signature page along with signature pages for the other BCOWW members. But John Williams cannot recall when, in the past decade, he last remembers seeing these signature pages. Moreover, neither John nor Libby Williams can recall how BCOWW allegedly obtained Collins's signature page. The Williamses each testified that they never saw Collins execute or deliver a signed copy of the employment agreement. John Williams's speculative testimony that Collins likely handed him the executed signature page is unconvincing.

9. BCOWW's final member, Osborn Barrett, claimed during his testimony that "everyone" signed the employment agreement, but like the Williamses, Barrett admitted that he did not see Collins execute the agreement. Nor did Barrett claim he ever saw a copy of Collins's executed agreement or even the signature page. Indeed, Barrett testified that he was not even sure the unexecuted copy of the employment agreement he produced in this case (Exhibit 5 to Collins's deposition) was the "final final [agreement]," i.e., that it could have been an earlier draft. Barrett also admitted he does not have "the best memory."

10. John Williams admitted that nobody ever told Collins he could only continue working with BCOWW if he signed the employment agreement.

11. BCOWW has submitted evidence indicating that at one point Collins may have been under the impression he had executed an employment agreement with the company. Specifically, shortly before his resignation, Collins contacted BCOWW's attorney, Larry Berkman, to inquire about "what [Berkman] had relating to possible employment agreements." (*See* Collins testimony). BCOWW also offered emails sent by Collins in which he discusses a need to "void" his employment agreement with BCOWW. (*See, e.g.*, Collins Dep. Exs. 8-9). This evidence arguably conflicts with Collins's testimony that at no point did he believe he had

ever executed a non-compete agreement with BCOWW, although Collins contends these communications just demonstrate his efforts to confirm that no executed agreement existed, and that he took these steps after he became aware BCOWW was taking a contrary position. Whether or not Collins ever believed that he may have executed an agreement, the evidence presented during the hearing makes it very unlikely that a fact finder would conclude that Collins in fact executed an agreement.

C. BCOWW's Texas and fleur-de-lis waffle makers

12. Shortly after BCOWW's formation, Collins and John Williams traveled to China looking for manufacturers that could make products for resale in the United States. (*See* John Williams testimony). Although BCOWW explored manufacturing various types of products, it eventually settled on producing a home waffle maker that could make waffles in the shape of Texas. (*Id.*) During their trip to China, Collins and Williams visited the Canton fair—a trade fair with a focus on export trade[7]— and encountered a booth hosted by a Chinese manufacturer specializing in producing home appliance products. (*Id.*) That manufacturer was later bought out by a company known as Elec-tech. (*Id.*)

13. John and Libby Williams testified that BCOWW thereafter engaged Elec-tech to manufacture the Texas waffle maker, graphic artist Bruce Carr to design the box, and engineer Scott Crossman to design the plates. According to Libby Williams, BCOWW also sought the assistance of Chinese consultant HaiJie Qi to help facilitate sourcing from China. All of these individuals were engaged as contractors; none were employees of BCOWW. (*See* Libby Williams testimony). It is undisputed that Collins had relationships with Crossman and Qi that predated his or their relationship with BCOWW. (*See id.*; *see also* Collins testimony).

---

[7] *See* http://www.cantonfair.org.cn/html/cantonfair/en/about/2012-09/130.shtml.

Moreover, Elec-tech is a publicly available company. (*See* http://www.elec-tech.com.hk/company/index.php).

14. It is also undisputed that BCOWW did not enter into exclusivity or non-disclosure agreements with Carr, Crossman, Qi, or Elec-tech. (*See* Libby and John Williams testimony). In fact, there was no evidence presented at the hearing that Carr, Crossman, Qi, or Elec-tech were placed under *any* restrictions regarding how they were to treat information received from or provided to BCOWW or information about BCOWW. There is no evidence in the record that any of these contractors were made aware of, let alone that they agreed to be bound by, the Restated Company Agreement and its confidentiality provision, notwithstanding Paragraph 12.12's requirements.

15. In 2011, BCOWW began producing and selling a second waffle maker—one that made waffles in the shape of a fleur-de-lis. (*See* Libby and John Williams testimony).

D. BCOWW's maple-leaf waffle maker

16. Sometime between 2010 and 2012, BCOWW discussed expanding its product line to include a waffle maker that makes waffles in the shape of a maple-leaf. The parties dispute who conceived of this idea. Libby and John Williams both testified that Barrett conceived of the idea based upon his Canadian roots, while Collins testified that the idea was his. Regardless, it is undisputed that BCOWW invested money exploring the concept up until approximately 2015, paying Crossman to engineer the maple-leaf plates and Carr to create the design work for the box. (*See, e.g.*, Pl. Exs. 3-9). BCOWW also contracted with a "maple leaf sales guy." (Pl. Ex. 7).

17. As with the Texas and fleur-de-lis waffle makers, BCOWW did not enter into exclusivity agreements with Carr, Crossman, Qi, or Elech-tech with respect to the maple-leaf

waffle maker.  (*See* Libby and John Williams testimony).  Nor did BCOWW ever require these vendors to sign non-disclosure agreements. (*Id.*)  When questioned by the undersigned, John Williams admitted that company information was routinely provided to these vendors via unsecured email, and that the documents were not marked "confidential."  (*See* John Williams testimony).  Moreover, despite the procedures outlined in Paragraph 12.12 of the Restated Company Agreement, BCOWW never placed any restrictions upon the vendors' storage or use of the information; nor did BCOWW even have an expectation that the vendors keep the information confidential.  (*See* John Williams testimony).[8]  As John Williams conceded, Crossman would have been free to openly use BCOWW's designs in his customer portfolio. (*Id.*)  Finally, the evidence reveals that BCOWW did not even retain copies of information any information relating to the maple-leaf waffle maker.  Instead, BCOWW left all of this information in the hands of its vendors.  (*See* Collins Dep. Ex. 27) (John Williams email to Qi requesting "[a]ny information, design, or engineering plans" that Qi has regarding the Texas, fleur-de-lis, and maple-leaf waffle makers).

18.    When it initially pursued the maple-leaf concept, BCOWW secured interest in the product from retailer Canadian tire and explored whether other large retailers such as TJX and Costco Canada would also be interested.  (*See* Pl. Exs. 8-9; Collins Dep. Ex. 33).

19.    Over the years, Collins requested on several different occasions that BCOWW bring the maple-leaf product to market.  (*See* Collins testimony; *see also* Def. Ex. 4).  However, from 2012 through 2016, the other BCOWW's members informed Collins that this could not occur at least until the company paid down its line of credit. (*See* Libby and John Williams

---

[8] On cross-examination, Mr. Williams speculated that he "probably" instructed Carr at some point over the years to keep BCOWW's graphics confidential.  However, Mr. Williams also conceded that he has no independent recollection that such an instruction was ever made.

testimony & Collins testimony). Collins testified that John Williams informed him that the other BCOWW members would also first need to also be paid back their initial investment, which—according to Collins—would have taken many years. (*See* Collins testimony).

E. Collins begins pursuing the maple-leaf waffle maker on his own, while still an officer and member of BCOWW.

20. Disagreeing with the "financial management decisions" of the other members as well as their "lack of desire to grow the business," Collins informed Qi on August 12, 2016 that he had decided to "do[] the Canadian Maple Leaf waffle maker on [his] own-outside BCOWW," and inquired whether Qi would join him in his new venture. (*See* Collins Dep. Ex. 23). When Qi asked Collins why he would not simply purchase BCOWW to pursue this opportunity, Collins responded that he "do[es] not think the cost of buying the business would provide a successful foundation for continuing the business." (*Id.*) However, Collins also noted that "maybe in the future once the business really starts to flounder there could be an opportunity where my partners are more willing to look at a realistic price." (*Id.*) Although Collins recognized that there was a risk in pursuing this endeavor without BCOWW, Collins explained to Qi that because he was forming a new company with a different name, it would be hard for his partners to discover he was starting a competitive company. (*Id.*) Finally, Collins informed Qi that the legal "down side is minimal." (*Id.*) According to Collins, even if BCOWW decides to pursue legal action "there is no way to patent or trademark any of the work that has been done so far." (*Id.*)

21. Thereafter, Collins, while still a BCOWW member and officer, took active steps to begin forming a new company, JADAC, to compete with BCOWW in producing and selling maple-leaf waffle makers. The evidence reveals that Collins sought to use BCOWW's design, artwork, and packaging to produce a similar, if not identical, maple-leaf waffle maker, as the one

Collins was involved in designing during his time with BCOWW. Specifically, Collins contacted Carr to obtain a quote regarding the cost to "modify the unit box artwork, instruction sheet, and shipping cartoon with new company verbiage and network." (*See* Collins Dep. Exs. 34-36). In one email to Carr, Collins revealed that the "basic unit design will remain the same except we will reduce the supplier from 800 to 700 watts." (Collins Dep. Ex. 34). In another series of emails to Carr, Collins explained, "my new company name will be JADAC LLC. I will be setting that up later this week." (*See* Collins Dep. Ex. 35). "I need to settle some open issues with BCOWW and set up my LLC. Then we are off to the races." (*See* Collins Dep. Exs. 36). On the advice of Carr, Collins aimed to have the product ready in time for Canada's Sesquicentennial, which was July 1, 2017. (*See* Collins Dep. Exs. 8, 33; *see also* Collins testimony).

22. Collins also continued to solicit Qi's participation in his new venture, directing Qi to contact BCOWW's manufacturer, Elec-tech, to see if it could manufacture the maple-leaf waffle maker using BCOWW's current design but modifying the wattage and powder coating. (*See* Collins. Dep. Exs. 24, 29; *see also* Pl. Ex. 12). To aid in his discussions with Elec-tech, Qi sent the manufacturing company a file containing a maple-leaf design that Collins had worked on for BCOWW (presumably with Crossman) several years prior. (*See* Collins Dep Ex. 24).

23. Collins concedes that he never received BCOWW's permission to use the maple-leaf design. (*See* Collins Dep. at 163:6-22).

24. On August 30, 2016, Collins emailed Qi the following "high level plan" in pursuing the maple-leaf waffle maker:

> #1. Get free of BCOWW - by mid -September
> #2. Approach Canadian Tire to see what sort of interest they may still have.
> #3. Depending on how Canadian Tire goes; set up company, create website, start tooling and packaging.

#4. Depending on interest from Canadian Tire - approach bank for financing of
production order and remainder of tooling

(*See* Collins Dep. Ex. 29).

25.     Although Collins conceded to Qi that starting this new business was a gamble, he
also explained how he believed his experience at BCOWW would be useful. As Collins
explained to Qi:

> When we started the Texas Waffle maker, we invested the cost of the tooling and
> a 20ft container load of product before we even had a single customer. That was
> about $75,000. We were able to sell it into Bed Bath & Beyond after a couple
> years because they saw our booth at the Dallas Market. I now have this contact, so
> it would be much easier to get the Maple Leaf into Bed Bath & Beyond. And, if
> we can do this, then it will be much more appealing to Canadian Tire, Home
> Sense, and The Bay Home Outfitters in Canada.

(*See* Collins Dep. Ex. 28).

26.     On September 16, 2017, Collins emailed both Qi and Carr asking them to send
him any "saved emails" relating to BCOWW's efforts to develop the maple-leaf waffle maker.
(*See* Pl. Exs. 21-22).

F.   Collins resigns from BCOWW and continues to build a maple-leaf waffle maker
     business.

27.     The very next day, on September 17, 2016, Collins submitted his resignation to
BCOWW. (*See* Collins Dep. Ex. 9). Collins, however, technically retained ownership interest in
the company until January 23, 2017, when he formally executed an Assignment of Interest. (*See*
Ex. H to Verif. Compl.) Nevertheless, BCOWW did not consider Collins to be a member of the
company as of September 17, 2016, the date Collins resigned. (*See* John Williams testimony).

28.     After resigning, Collins continued with his efforts to build a maple-leaf waffle
maker and get the product ready for sale. After reviewing Collins's emails in the record, it
appears that Collins initially planned to use BCOWW's design and manufacturer. Specifically,

Collins emailed Carr towards the end of September instructing him to "[r]eplace [t]he bcoww logo with [his] Jadac LLC logo" and "[t]weak the original design just enough to make it slightly noticeable from the original."  (*See* Pl. Ex. 20).  As Collins explained, "[w]e worked really hard on the initial design and I do not want to give it up." (*Id.*)

29.     Collins also contacted Elech-tech representative Candy Chan—a contact he made during his time with BCOWW—for a quote on October 12, 2016.  (*See* Collins Dep. Ex. 25).  In his email to Chan, Collins appears to seek a contract with Elec-tech to the exclusion of BCOWW.  (*See id.*) (explaining "I think it would be worthwhile for Elec-tech to quote the product and related tooling to Jadac because I created the product and therefore, Jadac has all the engineering and related data to make the product.  BCOWW does not have any of the data and is therefore unable to pursue the product.")  In preparing his request for quote, Collins used a pro forma invoice Elec-tech had previously sent BCOWW for BCOWW's maple-leaf waffle maker, "whit[ing] out the bcoww info."  (Collins Dep. Ex. 43).  Ultimately, Elec-tech refused to work with Collins on the maple-leaf waffle maker.  (*See* Pl. Ex. 19).  Consequently, Collins was forced to locate a new manufacturer and create a new design.  (*Id.; see also* Collins testimony).

30.     Both John Williams and Barrett testified that the waffle maker Collins eventually manufactured is not identical to BCOWW's waffle maker "for a number of reasons," and in fact, is in their opinion, an inferior product.

31.     In locating a new manufacturer, Collins was able to compare BCOWW's manufacturing costs with the costs quoted by new prospective manufacturers, and discussed these costs with Carr.  (*See* Pl. Ex. 27) ("[w]here bcoww is paying $____/ea –these new

suppliers are between $__-$__ depending on the design)[9]; (*see also* Collins Dep. Ex. 50) ("I have sent initial contact emails to all of these suppliers and am now waiting for their responses back as to whether or not they will customize an existing model for the Maple Leaf project. Most of these are substantially less expensive than what bcoww is paying for their products now from Elec-Tech.")

32.     To sell his product, Collins also called upon a buyer for Bed Bath and Beyond Canada who Collins admittedly met while a member of BCOWW. (*See* Collins testimony). Bed Bath and Beyond Canada is one of JADAC's largest customers. (*See* Collins testimony; *see also* Collins Dep. Ex. 45). Bed Bath & Beyond was also a significant customer for BCOWW's Texas waffle maker. (*See* John Williams testimony).

33.     On October 26, 2016, Collins individually filed a trademark application to register a mark consisting of the words "Maple Leaf" arched above the words "Waffle Maker" with a background resembling the Canadian flag and a maple-leaf in between the text. (*See* Ex. L to Verif. Compl.) Collins admits that this application included artwork produced by Carr and paid for by BCOWW.[10] (*See* Collins testimony).

34.     Collins officially formed JADAC in November 2016. (*See* Collins Dep. Ex. 19).

35.     That same month, Collins contemplated creating a new product called the "Lone Star Waffle Maker." (*See* Collins Dep. Ex. 38).

---

[9] Due to the allegedly sensitive nature of this information, the undersigned has intentionally omitted BCOWW's pricing information from this recommendation, although it is contained in Plaintiff's Exhibit 27, which was filed under seal. However, witnesses also testified to this in the courtroom, without any attempt by any party to close the courtroom or seal the testimony.

[10] The USPTO ultimately refused the registration on the grounds that the applied-for mark included a simulation of a Canadian flag. (*See* Ex. L to Ver. Compl. at 14). Collins subsequently filed a second trademark application, on February 6, 2017, omitting the use of the Canadian flag to try to cure this deficiency. (*See* Ex. M to Ver. Compl. at 4). But according to Defendants, the USPTO denied the application on the grounds that a maple-leaf is not a design that can be trademarked.

36.     At some point, Collins apparently became concerned that BCOWW might pursue legal action against him.  Accordingly, on January 11, 2017, Collins emailed John Williams to inform Williams of the pending trademark application, but explained that he has "no intention of preventing BCOWW from pursuing its business goals" and informing BCOWW that he was "willing to discuss the authorized use of these trademarked logo design features free of charge." (Def. Ex. 12).  BCOWW did not respond to this email.  (*See* John Williams testimony).  Instead, nine days later, John Williams contacted Elec-tech to begin manufacturing its own version of the maple-leaf waffle maker.  (*See* Def. Ex. 13).  Notably, BCOWW did not contact Collins to insist that he cease and desist using the logo; nor did it seek a TRO or any other relief from this or any other court.

37.     Collins began selling his maple-leaf waffle maker through JADAC's website on or about May 1, 2017.  (*See* Collins Dep. Ex. 17; *see also* Collins testimony).  Collins also advertised a "Lone Star Texas Waffle Maker" and "Fleur de Lys Waffle Maker" on the website as products that were "Coming Soon." (Collins Dep. Ex. 17).

38.     To date Collins has sold approximately 1,500 maple-leaf waffle makers, and has approximately 4,000 units in his fulfillment center left to sell.  (*See* Collins Dep. 133:7-11; 223:14-19).

G.  BCOWW files suit.

39.     Libby Williams testified that BCOWW made the decision to proceed with the maple-leaf waffle maker the same month Collins left the company (September 2016), and John Williams testified that the decision was made either in September or October 2016 in light of anticipated holiday sales.  According to John Williams, BCOWW only discovered that its Texas waffle maker would appear in stores in time for the holiday season after Collins resigned.  Thus,

according to John Williams, the anticipation of holiday sales—not Collins's actions—drove BCOWW's decision to resume its maple-leaf waffle maker plans.

40.     Libby Williams claims that around the time Collins launched his website, BCOWW allegedly happened to "Google" maple-leaf waffle makers to better understand the market.  (*See* Libby Williams testimony).  She claims that when this search turned up the JADAC waffle maker, BCOWW decided to sue Collins.

41.     The Williamses' testimony regarding the timing of BCOWW's decision to sell the maple-leaf waffle maker is not credible.  First, it is undisputed that John Williams informed Collins shortly before Collins resigned that BCOWW would not pursue the maple-leaf waffle maker until BCOWW *actually* paid down its line of credit, not once the possibility of paying it down arose.  (*See* John and Libby Williams testimony).  Second, nowhere in BCOWW's September 2016 or December 2016 meeting minute notes does BCOWW even reference the maple-leaf waffle maker.  (*See* Def. Exs. 10-11).  In fact, notes from BCOWW's December 2016 meeting suggest that BCOWW was still concerned about funds at that time.  (*See* Def. Ex. 11) (discussing the "status of [the] line of credit" and "the unpredictability of future markets with our current products and any future products").  Third, at no point during the negotiations regarding the valuation and repurchase of Collins's shares did BCOWW ever mention its plans to develop the maple-leaf waffle maker or any costs associated with the product.  (*See* John Williams testimony; Collins testimony; Def. Ex. 2).  Rather, the evidence strongly suggests that BCOWW did not decide to pursue the maple-leaf waffle maker until *after* it received Collins's January 11th email and Plaintiffs realized Collins was planning to start selling it himself.  Moreover, this evidence suggests that Plaintiffs became aware that Defendants were selling or planning to sell a maple-leaf waffle maker in January, but they did not take steps to protect the information they

are now claiming is confidential or secret at that time.  Instead, they decided to bring their own waffle maker to market—i.e., they decided to compete.

42.     John Williams testified that to date BCOWW has only sold twelve of its maple-leaf waffle maker with an anticipated profit of approximately $15 per unit.[11]

43.     BCOWW filed the instant suit against Collins and JADAC on May 1, 2017.  (*See* Verif. Compl.)  It is BCOWW's contention that Collins's alleged unlawful actions caused its low maple-leaf waffle maker sales.

## IV.     REQUEST FOR RELIEF

BCOWW seeks injunctive relief on its claims for breach of contract, misappropriation of trade secrets, tortious interference,[12] and breach of fiduciary duty, requesting that the Court issue an injunction that prohibits Defendants from:

> making, using, selling, offering for sale, manufacturing, advertising, promoting, or offering to do one of the preceding, or otherwise conducting business with regard to waffle makers that: (a) make waffles in the shape of the State of Texas, (b) make waffles in the shape of a Fleur de Lis; or (c) make waffles in the shape of a Maple Leaf."

(*See* Pl. Br. at 7 & [#44]).  BCOWW requests that the injunction apply to Defendants' activities anywhere in the world (if it prevails on its claims for trade secret misappropriation, for breach of fiduciary duty, for tortious interference, or for violation of Section 11.8 of the Restated Company Agreement) or anywhere in the United States (if it prevails on its claim for breach of Collins's

---

[11] John Williams testified that BCOWW's profit margin on the Texas waffle maker was $15 per unit and that BCOWW anticipated a similar profit margin on its maple-leaf waffle maker.

[12] Although BCOWW's application only requests injunctive relief with respect to its claim for tortious interference with *existing* contracts, in subsequent briefing, BCOWW has asserted that injunctive relief is also appropriate on its claim for tortious interference with *prospective* business relations.  The undersigned addresses both causes of action in this recommendation.

employment agreement).  (*See id.*) BCOWW also seeks an injunction enjoining Defendants from "disclosing and/or using any information or data that was created by, or for, Plaintiffs." (*Id.*)[13]

## V.   ANALYSIS

The District Court should deny BCOWW's application for a preliminary injunction because BCOWW has not established a substantial likelihood of success on the merits on its claims for breach of contract, trade secret misappropriation, or tortious interference.  Moreover, although BCOWW may have presented sufficient evidence to establish a likelihood of success on its claim for breach of fiduciary duty, the Court should deny BCOWW's request for the extraordinary remedy of a preliminary injunction because BCOWW has not presented sufficient evidence to show that it would suffer irreparable harm if the injunction were not granted.

**1.   BCOWW is not likely to succeed on the merits of its claims for breach of contract or tortious interference with an existing contract.**

BCOWW claims it is entitled to injunctive relief because Collins breached the non-compete and confidentiality provisions of his employment agreement and that JADAC tortiously interfered with Collins's employment agreement.   However, BCOWW cannot establish a likelihood of success on the merits on these claims because it cannot prove a critical element of both claims: that an enforceable agreement exists between BCOWW and Collins.

Under Texas law, employers may obtain injunctive relief against an employee who breaches a non-compete agreement with reasonable restrictions or who violates a confidentiality agreement.  *See* Tex. Bus. & Com. Code Ann. § 15.51(a) (providing for "damages, injunctive relief, or both" for a breach of a non-compete agreement by the promisor); *Daugherty v. Highland Capital Mgmt., L.P.,* No. 05-14-01215-CV, 2016 WL 4446158 at *4-8 (Tex. App. —

---

[13] Notably, BCOWW does not limit its request for injunctive relief to information it considers to be a trade secret or confidential.

Dallas, Aug. 22, 2016, no pet.) (upholding trial court's award of permanent injunction based upon defendant's breach of the confidentiality provision of his employment agreement even though the information at issue did not meet the definition of a trade secret). Injunctive relief is also available on claims for tortious interference. *Graham v. Mary Kay Inc*., 25 S.W.3d 749, 755 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("Injunctive relief is an appropriate remedy when a claim of tortious interference is involved."). But BCOWW admits that it cannot produce an executed copy of Collins's employment agreement, and Collins emphatically denies ever executing one.

It is a fundamental principle of contract law that to prevail in a breach of contract action, a plaintiff must prove the existence of a valid enforceable contract, which of course requires proof of the defendant's acceptance. *See Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 448 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *see also* Tex. Bus. & Comm. Code § 15.50(a) (a covenant not to compete is enforceable if it is "part of an otherwise enforceable agreement"). Similarly, the first element of a claim for tortious interference with an existing contract is the existence of a contract subject to interference. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc*., 29 S.W.3d 74, 77 (Tex. 2000).

In this case, BCOWW has not presented evidence that would suggest it will be able to prove that a valid employment agreement exists between Collins and Defendants. In fact, Collins swore under oath that although he received a copy of the draft employment agreement, he never executed it. He was even able to produce the original, signed transmittal letter on bonded paper from the law firm, as well as the enclosed, unexecuted copy of the agreement (also printed on bonded paper), and the envelope the law firm enclosed so that he could return the agreement. This evidence, coupled with Collins's firm testimony that he never signed the

agreement, render unconvincing the Williames' vague testimony of recollections of seeing an executed signature page at some point in the last nine years and their unsupported accusations that Collins might have stolen the only executed copies. The Williamses and Barrett admit they do not recall ever following up with Collins regarding his execution of the employment agreement, and no one is claiming (nor could they with any credibility) that they have a specific recollection of him signing the agreement.

In sum, although BCOWW may have intended its members to execute employment agreements, BCOWW has failed to meet its burden in proving that Collins ever executed one.[14] This is fatal to BCOWW's claims for breach of contract and tortious interference with an existing contract.[15] Because BCOWW cannot establish a likelihood that it will succeed on the merits of these claims, they cannot serve as the basis of injunctive relief.

## 2. BCOWW is not likely to succeed on the merits of its claim for tortious interference with prospective business relationships.

BCOWW also cannot establish a likelihood of success on the merits as to its claim for tortious interference with prospective business relationships because there is no evidence that Collins's actions were independently tortious, or that the conduct caused BCOWW to suffer any

---

[14] BCOWW attempts to establish the existence of Collins's employment agreement through the lost-document doctrine. (*See* Pl. Br. ¶ 34 (citing *United States v. Carriles*, No. EP-07-CR-0087-KC, 2010 WL 4918770, at *11 (W.D. Tex. Nov. 19, 2010) (explaining use of duplicates when the original is lost or destroyed)). While this rule of evidence may be used to prove up the contents of a lost document, it cannot be used to prove acceptance. BCOWW also argued at the hearing that there was an implied employment contract based upon the parties' dealings. The undersigned cannot imagine a situation where a court would find an implied contract compliant with the requirements of Section 15.50. Even assuming an implied covenant not to compete could be possible, the two year non-compete BCOWW seeks to enforce would violate the statute of frauds. *See* Tex. Bus. & Com. Code § 26.01(a), (b)(6) (statute of frauds demands that an agreement that is not to be performed within one year from the date of making the agreement must be in a signed writing).

[15] Notably, BCOWW has not pled or argued that Collins breached the confidentiality provision of the Restated Company Agreement—a contract Collins indisputably executed.

actual damages. To prevail on a claim for tortious interference with prospective business relations, a plaintiff must establish that: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

There is some evidence in the record suggesting that Collins attempted to interfere with BCOWW's vendor relationships. (*See, e.g.,* Pl. Ex. 13 (instructing Carr to "stall" BCOWW should BCOWW contact him about the maple-leaf waffle maker logo design); Collins Dep. Ex. 25 (suggesting that Qi inform John Williams that he is busy to "buy us a couple days"); Collins Dep. Ex. 24 (encouraging Elec-tech to work with JADAC rather than BCOWW because "JADAC has all the engineering and related data to make the product. BCOWW does not have any of the data and is therefore unable to pursue the product.")). However, this interfering conduct is neither independently tortious nor otherwise unlawful. None of Collins's conduct was defamatory or fraudulent. Collins never threatened physical harm. Conduct that is merely "sharp" or unfair is not actionable in tort and cannot be the basis for a claim for tortious interference with prospective relations. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).

Moreover, the evidence establishes that BCOWW was not harmed as a result of Collins's attempted interference. Ultimately, Elec-tech decided to contract with BCOWW, not JADAC; in fact, Collins was forced to find a new manufacturer and create a new design. And Collins's

conduct did not interfere with BCOWW's relationship with its box or plate designers (Carr and Crossman, respectively), because that work had already been completed long before Collins left, which is why BCOWW was able to immediately get the maple-leaf waffle maker to market once it decided to. The record does not contain evidence that Collins's statements caused any delay in BCOWW's product reaching the market. Accordingly, BCOWW cannot establish a likelihood of success on the merits on its claim for tortious interference with prospective business relationships, and therefore this claim cannot serve as the basis for injunctive relief either.

### 3. BCOWW is not likely to succeed on the merits of its claim for trade secret misappropriation and regardless, has not demonstrated irreparable harm.

BCOWW has not established it is likely to succeed on the merits as to its claim for trade secret misappropriation because some of the information at issue—the identities of BCOWW's customer and vendors and relationships formed with them—are not trade secrets as a matter of law, and significantly, there is no evidence that BCOWW took any reasonable steps to maintain the secrecy of its alleged trade secrets. Even assuming BCOWW were likely to succeed on a trade secret misappropriation claim, there is no evidence that BCOWW would suffer an irreparable injury if an injunction is not granted.

### a. Merits of the TUTSA Claim

Because the alleged misappropriation occurred in 2016, the Texas Uniform Trade Secrets Act ("TUTSA"), not common law, governs this dispute.[16] *See* Uniform Trade Secrets Act, 83rd Leg., R.S., ch. 10, § 3, 2013 Tex. Gen. Laws 12, 14 (TUTSA applies "to the misappropriation of a trade secret made on or after [September 1, 2013]"). Moreover, all claims based upon facts related to misappropriation are preempted. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.007

---

[16] Inexplicably, Plaintiffs do not cite in their original Brief in support of their request for a preliminary injunction [#2-3; #43-2]. In fact, Plaintiffs did not even mention TUTSA until their post-hearing brief [#51].

("this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."); *see also Mortgage Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577, at *6 (W.D. Tex. Mar. 2, 2016). Pursuant to TUTSA, a court may grant an injunction for "actual or threatened misappropriation." Tex. Civ. Prac. & Rem. Code § 134A.003(a). Thus, to bring a cause of action pursuant to TUTSA, BCOWW must establish that it owned trade secrets that Defendants misappropriated.

> TUTSA defines a trade secret as:
>
> [A]ll forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if: (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code § 134A.002(6). Designs, pricing information, marketing strategies, customer lists, and client information are all categories of information that have been recognized as trade secrets, if they meet the criteria for such. *See, e.g., A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 909, 916 (S.D. Tex. 2015).

BCOWW argues that the following information constitutes trade secrets that Defendants misappropriated: 1) drawings (engineering plans for the maple-leaf waffle maker and graphics for the box), 2) pricing information and strategies, 3) market strategy concerning development of the maple-leaf waffle maker; 4) customer lists and contacts for customers; and 5) information identifying suppliers/vendors. (*See* Pl. post-hearing Br. at 3). BCOWW also appears to argue that its relationships with customers and vendors qualify as trade secrets. (*Id.* at 4). As an initial

matter, no evidence was presented at the hearing of any marketing strategies. Neither was there evidence that BCOWW had customer list or vendor list that Collins was able to use.[17] BCOWW did, however, present evidence that Collins took its waffle maker engineering designs, its box design, and that he knew and used the contact information for vendors and one customer as well as the basic pricing information related to the Texas waffle maker. The undersigned will address each of these in turn.

i. Customer and vendor information

Customer and vendor *lists* can be trade secrets. But where the names and addresses of customers and vendors on a party's customer or vendor list are "readily ascertainable," the list is not protectable as a trade secret. *A.M. Castle*, 123 F. Supp. 3d at 916. There was no evidence presented at the hearing that Collins had taken and was working from a list or compilation of customer or vendor information. Rather, BCOWW claims that the names of its customer and vendor contacts qualify as trade secrets because Collins learned this information by virtue of his tenure with BCOWW. (*See* Pl. post-hearing Br. at 4). As a preliminary matter, Collins knew both Qi and Crossman and had their contact information prior to working for BCOWW, so this assertion is factually incorrect, at least with regard to these two contractors. Collins may have become introduced to BCOWW's contact with Elec-Tech, Carr, and Bed Bath and Beyond Canada because of his position, but that does not mean their identity and contact information are secret.

Plaintiffs concede that contacts for individual vendors or customers may be readily identifiable through the internet, trade shows, or the yellow pages, but argue that these names are

---

[17] Although Collins admitted in one email to exporting an "email contact file" from his BCOWW laptop, the evidence reveals that the file was corrupt and therefore, Collins was unable to make use of this information. (*See* Pl. Ex. 33).

nevertheless entitled to trade secret protection because the general public does not know the specific engineer, graphic designer, consultant, or manufacturer that BCOWW uses. (*Id.*) This argument runs contrary to a basic premise of trade secret law: to be protectable, information must be *secret*. *See Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 611 (5th Cir. 2011) ("It is self-evident that the subject matter of a trade secret must be secret."). The fact that Collins may have learned this information by virtue of his position at BCOWW or that it might take longer for a member of the general public to discover it does not render non-secret information a secret. Employees can become aware of or learn all sorts of information through their employer, but unless the employer protects and treats the information as secret, it is not protected against disclosure. For instance, an employer may purchase commercially-available training materials to train employees in a certain skill. Another employer may develop training materials in house—invest significant time and resource in that endeavor and require those who develop it and those trained with it to sign acknowledgments that the materials are confidential and agreements not to disclose what they learned. The second employer can likely protect the training materials as secret; the first cannot.

To be "secret," information must be "neither generally known by others in the same business nor readily ascertainable by an independent investigation." *A.M. Castle,* 123 F. Supp. 3d at 915. Accordingly, "names of customers ascertainable through public sources will not be protected as trade secrets." *Panther Sys. II, Ltd. v. Panther Comput. Sys., Inc.*, 783 F. Supp. 53, 67 (E.D.N.Y. 1991).

There is no evidence in the record that the identities of BCOWW's vendor or customer contacts were ever a secret. Vendor and client *identities* are not described as "confidential information" in Paragraph 12.12 of the Company Agreement. No evidence was presented that

any of these vendor or clients were required to execute non-disclosure agreements or that they were in any way prevented from disclosing that they working with BCOWW on designs related to or the production of BCOWW's waffle makers. Accordingly, this information cannot acquire trade secret protection.[18]

Customer relationships do not qualify as trade secrets just because a company invests time and money to cultivate those relationships. *See Aerosonic Corp. v. Trodyne Corp.*, 402 F.2d 223, 230 (5th Cir. 1968) (noting that an "advantageous business relationship" between an employer and its customer is not a trade secret). This is the very reason why many employers insist upon non-compete agreements: to protect their goodwill and to prohibit former employees (for a reasonable period of time) from being able to take advantage of that time and investment to their detriment. After failing to properly bind Collins with a non-compete or non-solicitation agreement, BCOWW cannot now rely on TUTSA to protect the relationships instead—TUTSA protects an employer's secrets, not its relationships.

## ii. Drawings and pricing information

BCOWW also points to the fact that Collins took its waffle maker designs and knew and used the pricing information of BCOWW waffle makers. Design and pricing information are certainly protected by TUTSA—if the information is, in fact, kept secret. The record before this Court reveals that BCOWW failed to take *any steps* to maintain the secrecy of this information.

TUTSA expressly requires that a trade secret owner take "reasonable measures under the circumstances to keep the information secret." Tex. Civ. Prac. & Rem. Code Ann. §

---

[18] By way of example, as an employee of a law firm, the undersigned learned her law firm's preferred vendors, including court reporters, website designers, and marketing consultants. The law firm's use of these vendors, however, was not a secret, and the firm took no steps to conceal the identity of those vendors. Accordingly, the undersigned could have set up a competing law firm using these same vendors.

134A.002(6)(A). TUTSA is based on the Uniform Trade Secrets Act ("UTSA"), which contains a nearly identical provision. Unif. Trade Secrets Act § 1(4)(ii). In the comments to this provision, the UTSA drafters explain that "reasonable efforts to maintain secrecy" may include advising employees of the existence of a trade secret or limiting access to a trade secret on a "need to know basis." *Id.* On the other hand, an employer's public disclosure of information or other carelessness with the information can preclude protection of that information as a trade secret. *Id.*

This means that "a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003) (interpreting the Illinois Trade Secrets Act) (citing *Jackson v. Hammer*, 274 Ill.App.3d 59 (1995) ("[T]he Act requires a plaintiff to take 'affirmative measures' to prevent others from using information.")). Courts in Texas and other states who have adopted this provision of the UTSA have concluded an employer fails to take reasonable steps to preserve secrecy in circumstances where the employer does not require its employees or third parties to sign a non-disclosure agreement, does not encrypt or otherwise protect its digital files, and does not mark its documents as confidential.[19]

---

[19] *See, e.g., Baxter & Assocs., L.L.C. v. D & D Elevators, Inc.*, No. 05-16-00330-CV, 2017 WL 604043, at *10 (Tex. App.—Dallas Feb. 15, 2017, no pet.) (record supported finding that the information in question was not the subject of reasonable efforts to maintain its secrecy where the employee worked for the employer for approximately six years before he was asked to sign a confidentiality agreement, the employee remained employed despite refusing to sign the agreement, the alleged trade secret data was not encrypted or protected by any monitoring system or file tracking software, and the "customer lists" in question were not labeled as confidential or proprietary); *Sortiumusa LLC v. Hunger*, No. 3:11-CV-1656-M, 2013 WL 11730655, at *12 (N.D. Tex. Mar. 31, 2013) (finding plaintiff's complaint alleging trade secret appropriation pursuant to the Georgia Trade Secrets Act was "fatally deficient" as a matter of law where plaintiff did not require its vendors to execute confidentiality agreements and failed to mark any of its drawings as confidential); *Telecom Am., Inc. v. Oncor Commc'ns, Inc.*, 31 Fed. App'x 809, 814–15 (4th Cir. 2002) (plaintiff did not make reasonable efforts to keep its database

Under some circumstances, an employer has been deemed to have taken reasonable steps if the employer showed that it at least verbally imparted the need to maintain confidentiality to its vendors. *See Learning Curve Toys,* 342 F.3d at 722 (finding plaintiff's reliance on an oral confidentiality agreement reasonable under the circumstances where plaintiff was a small unsophisticated company and its representative testified that it did not anticipate the defendant would violate the oral confidentiality agreement and utilize its concept without permission).

BCOWW took *none* of the above steps to protect the secrecy or confidentiality of information related to its design, pricing, or strategy for the development of its maple-leaf waffle maker. BCOWW did not require Carr, Crossman, Qi, or Elech-Tech to sign confidentiality or exclusivity agreements and routinely transmitted files to these vendors via unsecured email. BCOWW did not mark any of these documents as confidential or restrict its vendors' storage or use of the information. Nor is there any evidence that BCOWW even *verbally* imparted (or even internally discussed) the need for these vendors to maintain the secrecy of its information. In fact, John Williams testified that from BCOWW's perspective, Crossman would have been free to include BCOWW's designs in his personal portfolio. Moreover, when BCOWW ultimately decided to proceed with production of its maple-leaf waffle maker, it was forced to contact its vendors—third parties who were under no obligation to maintain the secrecy of BCOWW's information—to obtains copies of its designs. That the vendors were the only ones in possession of the information strongly cuts against any inference that BCOWW was attempting to protect this information as secret.

---

secret as required by the Maryland Uniform Trade Secrets Act where plaintiff produced no evidence of any agreement, procedure or other measure instituted to guard against unauthorized disclosure of this information and the employee entrusted to compile and disseminate the information was not instructed as to its alleged confidential nature).

Finally, when the undersigned questioned BCOWW's counsel regarding the steps the company took to maintain secrecy, counsel was only able to point to Collins's *unexecuted* employment agreement and a non-disclosure agreement BCOWW entered into with one of its salesman in 2015. BCOWW also apparently entered into a non-disclosure agreement with a sales and marketing company in 2014. (*See* Pl. Ex. 29). Thus, BCOWW had the knowhow and sophistication to require non-disclosure agreements under certain circumstances it believed were appropriate, i.e., with respect to its marketing and sales contracts. That BCOWW did not also require vendors who received information relating to the design and production of its maple-leaf waffle maker to sign confidentiality agreements strongly suggests that it did not regard this information as secret. This conclusion is bolstered by the confidentiality provision in BCOWW's Restated Company Agreement, which prohibits members from disclosing any information identified as being confidential to non-members unless the recipients of that information agree to be bound by BCOWW's confidentiality requirements. (*See* Restated Company Agreement ¶ 12.12).

BCOWW nevertheless argues that it took reasonable efforts to maintain the secrecy of the information because it disclosed its information to persons who were subject to an "implied obligation not to use or disclose it" and that its employees and independent contractors were only provided confidential information on a limited basis. (*See*. Pl. post-hearing Br. at 5). As a preliminary matter, Plaintiffs' arguments and citations to pre-TUTSA authority are unpersuasive in light of TUTSA's requirement that affirmative steps be taken to preserve the secrecy of information in order to qualify for trade secret protection. *See, e.g., Seismic Wells, LLC v. Matthews*, No. 5:15-CV-148-C, 2016 WL 3390507, at *3 (N.D. Tex. Feb. 22, 2016) (finding plaintiffs' arguments relying entirely on the common law of trade secret misappropriation prior

to 2013 unpersuasive in light of TUTSA's "modern definition of a trade secret"). Regardless, BCOWW's vendors were not even subject to an exclusivity agreement, and there is no evidence in the record to support a finding that they would have considered themselves under even an implied obligation of confidentiality. Moreover, BCOWW's argument that it only provided information to vendors on a "need to know" basis is not supported by the record either.

### b. Irreparable Harm

Even assuming BCOWW had established that it was likely to succeed on the merits on its TUTSA claim, there is no evidence that BCOWW would suffer an irreparable injury if an injunction is not granted.

The record reveals that although Collins may have initially contemplated and even taken steps to use BCOWW's design, he was unsuccessful in this endeavor. Ultimately, as BCOWW's members testified, Collins designed a new product that differed from BCOWW's maple-leaf waffle maker "for a number of reasons," and is allegedly significantly inferior to their waffle maker.

Although Collins knew (and even referred to in an email) BCOWW's manufacturing costs, it is not clear that he used this information to BCOWW's detriment. This is not a situation where a former employee used his employer's cost and pricing information to undercut a bid. All businesses who sell manufactured products aim to reduce manufacturing costs in order to increase profit, and Collins and JADAC are no exception. Collins would have searched for a manufacturer with the lowest costs, regardless of his knowledge of BCOWW's cost structure. And Collins, like any other competitor, could have done that with full knowledge of BCOWW's publicly available MSRPs, which would have provided him with a data-point on which to evaluate potential manufacturing costs. In any event, there no evidence in the record that Collins

disseminated BCOWW's waffle maker production costs to anyone other than Carr, a graphic artist who likely has no desire to compete in the waffle maker market.

Even assuming that Collins took or used a design or pricing information that is entitled to trade secret protection, Plaintiffs have not shown that they could not be made whole with monetary damages.[20]  BCOWW knows its expected profit margin on the maple-leaf waffle maker, as well as its expected sales.  John Williams even conceded during cross-examination that using this information, BCOWW could easily calculate its lost profits.  Because monetary damages can be readily calculated in this case, a preliminary injunction would be improper.  *See Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir.1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."); *see also Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (recognizing that "when economic rights are especially difficult to calculate, a finding of irreparable harm may be appropriate.")

Finally, the undersigned finds that Plaintiffs did not act with the sense of urgency consistent with a finding of irreparable harm.  BCOWW had knowledge that Collins intended to at least use its maple-leaf logo and packaging as early as January 11, 2017 when Collins emailed John Williams to inform him of Collins's pending trademark application.  Yet, BCOWW waited almost *four months* to file the instant lawsuit.  BCOWW's delay in seeking a preliminary injunction rebuts a finding of irreparable harm.  *See, e.g., H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, No. CIV.A.3:09CV00390-L, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009)

---

[20] At the hearing, BCOWW introduced evidence that Collins recently researched bankruptcy attorneys, implying that monetary damages would be unavailable should a judgment issue in BCOWW's favor.  However, Collins also introduced evidence that he does not have the financial means to pay a judgment at this point, and that his only income comes from revenue generated from the sale of JADAC's maple-leaf waffle maker.  Thus, should BCOWW secure a judgment against Defendants in this case, a reasonable royalty on the sales of JADAC's product would likely be the best option for BCOWW to recover damages.

(five-month delay in filing trademark-infringement suit after first learning of alleged infringing product rebutted a presumption of irreparable harm). Preliminary injunctions are extraordinary remedies and are designed to prevent future injuries, not to punish for past wrongs. *See Mississippi Power*, 760 F.2d at 621; *Wirtz*, 405 F.2d at 670. Here, Plaintiffs are requesting that the Court shut down JADAC's entire business and prevent it from being able to sell any of its inventory—an extraordinary request—when it did not even act promptly to protect its interests and step in before JADAC incurred the production costs and purchased the inventory.

### 4. The District Court should deny BCOWW's request for injunctive relief on its claim for breach of fiduciary duty

BCOWW is not entitled to injunctive relief on its breach of fiduciary duty claim either. Although BCOWW may have presented sufficient evidence to establish a likelihood of success on its claim for breach of fiduciary duty (although it is questionable whether BCOWW can prove Collins's alleged breaches caused it injury), it is undisputed that Collins is no longer a member of BCOWW, and thus owes BCOWW fewer duties than when he was a member and employee. Hence, he is unlikely to breach any existing fiduciary duty to BCOWW that would justify the issuance of an injunction.

Under Texas law plaintiffs may obtain injunctive relief for breaches of fiduciary duty, but only if the requirements for an injunction are met. *See, e.g.*, *Donaho v. Bennett*, No. 01-08-00492-CV, 2008 WL 4965143, at *1 (Tex. App.—Houston [1st Dist.] Nov. 20, 2008, no pet.) (mem. op.) (upholding trial court's award of injunctive relief for breach of fiduciary duty but modifying as to the breadth of the award). To prevail on a claim for breach of fiduciary duty, a plaintiff must establish that (1) a fiduciary relationship exists between the plaintiff and defendant; (2) the defendant breached his fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Hunn v. Dan Wilson Homes,*

*Inc.*, 789 F.3d 573, 581 (5th Cir. 2015) (citing *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.)).

BCOWW's primary argument that Collins breached his fiduciary duty is that Collins usurped a business opportunity. As a founding member and officer of BCOWW, Collins owed a fiduciary duty to BCOWW to refrain from "usurp[ing] corporate opportunities for personal gain." *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963). To establish a breach of fiduciary duty for usurping a corporate opportunity, BCOWW must prove that Collins misappropriated a business opportunity that properly belongs to the company. *In re Structual Software, Inc.*, 67 Fed. App'x 253 (5th Cir. 2003) (quoting *Landon v. S & H Mktg. Grp.*, 82 S.W.3d 666, 681 (Tex. App.—Eastland 2002, no pet.)).

Collins does not dispute that he owed BCOWW a fiduciary duty not to take advantage of corporate opportunities or that the maple-leaf waffle maker was a corporate opportunity that would have properly belonged to BCOWW. Rather, Collins disputes that BCOWW had the financial resources to take advantage of the business opportunity and alternatively, he argues that BCOWW abandoned the opportunity. A corporation's financial inability to take advantage of a corporate opportunity and the corporation's abandonment of a business opportunity are two defenses to a suit alleging usurpation of a corporate opportunity. *Landon v. S & H Mktg. Group, Inc.*, 82 S.W.3d 666, 681 (Tex. App.—Eastland 2002, no pet.); *see also Alexander v. Sturkie*, 909 S.W.2d 166, 173 (Tex. App.—Houston [14th Dist.] 1995, writ denied). Collins has introduced evidence to at least raise a genuine issue of fact that BCOWW either lacked the financial resources or abandoned the maple-leaf waffle maker project.

However, as a founding member and officer of BCOWW, Collins also owed BCOWW a fiduciary duty to conduct himself in the "utmost good faith in his relations to the corporation he

represent[ed]." *Imperial Grp. (Texas), Inc. v. Scholnick*, 709 S.W.2d 358, 363 (Tex. App.—

Tyler 1986, writ ref'd n.r.e.) (internal quotations omitted). Pursuant to this duty, Collins was

required to "make full disclosure of all material facts within [his] knowledge in any way relating

to the [BCOWW's] affairs." *Id.* The evidence demonstrates Collins breached that fiduciary duty

when he actively competed with BCOWW while still a member of the company and without full

disclosure to its members. Accordingly, assuming BCOWW can prove that it suffered an injury

as a result of Collins's breach of this duty, BCOWW has presented evidence establishing it could

succeed on the merits on its claim for breach of fiduciary duty.[21]

An injunction, however, would still be inappropriate in this case. BCOWW cannot

establish irreparable harm. First, as discussed above, monetary damages will fully compensate

BCOWW for any harm allegedly suffered as a result of Collins's actions. Second, Collins's

breach occurred in the past, and he is no longer a member or employee of BCOWW.

Accordingly, BCOWW cannot establish a reasonable likelihood that Collins will commit further

breaches of his fiduciary duty in the future, and effects from Collins's past violations cannot

---

[21] BCOWW also alleges that Collins breached his fiduciary duty by using or disclosing BCOWW's confidential information after he resigned from BCOWW. It is unclear whether this theory of liability is preempted by TUTSA. *Compare Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, No. 13-16-00663-CV, 2017 WL 3084294, at *10 (Tex. App.—Corpus Christi July 20, 2017, no pet. h.) (finding preemption because the "gravamen" of plaintiff's fiduciary duty claim duplicated its claim for trade secret misappropriation) *with Downhole Tech. LLC v. Silver Creek Servs. Inc.*, No. CV H-17-0020, 2017 WL 1536018, at *3 (S.D. Tex. Apr. 27, 2017) (finding no preemption because plaintiff pled alternative theories of relief—that the defendant misappropriated information protected as trade secrets and alternatively, that the misappropriated information, although not a trade secret, was confidential). Regardless, to prevail on a claim for breach of fiduciary duty for use or disclosure of a former employer's confidential information, an employer must still prove that the information had not otherwise been disclosed, which implicitly requires some element of secrecy. *See Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 581 (5th Cir. 2015) (draftsman did not breach fiduciary duty to former architectural design firm by finishing custom home plans directly for firm's client because the plans had already been disclosed to the client). As discussed above, BCOWW did not keep information related to its maple-leaf waffle maker confidential. Accordingly this cannot serve as a basis for injunctive relief.

serve as a basis for injunctive relief. *See Blatt*, 583 F.2d at 1334; *Armstrong*, 141 F.3d at 563.

BCOWW's request for a punitive injunction should be denied. *Wirtz*, 405 F.2d at 670. [22]

## VI.    CONCLUSION

For the reasons discussed above, the undersigned recommends that the District Court

**DENY** Plaintiffs' request for a preliminary injunction.

## VII.    INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO OBJECT/APPEAL

The United States District Clerk shall serve a copy of this report and recommendation on

all parties by either (1) electronic transmittal to all parties represented by attorneys registered as

a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified

mail, return receipt requested. Written objections to this report and recommendation must be

filed **within fourteen (14) days** after being served with a copy of same, unless this time period is

modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The party shall file

the objections with the clerk of the court, and serve the objections on all other parties. A party

filing objections must specifically identify those findings, conclusions or recommendations to

which objections are being made and the basis for such objections; the district court need not

consider frivolous, conclusive or general objections. A party's failure to file written objections

to the proposed findings, conclusions and recommendations contained in this report shall bar the

party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149–52

(1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to

---

[22] BCOWW also asserts that injunctive relief is proper because Collins breached Section 11.8 of the Restated Company Agreement, a provision that essentially contractually obligates BCOWW's members not to violate their fiduciary duties by usurping corporate opportunities. As a threshold matter, BCOWW's live complaint does not raise this claim. (*See* Verif. Compl.) Accordingly, BCOWW has waived the right to seek injunctive relief on this ground. Regardless, as with its claim for breach for fiduciary duty, BCOWW cannot obtain injunctive relief on this ground because the there is no reasonable likelihood of similar future violations.

file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 5th day of September, 2017.

ELIZABETH S. ("BETSY") CHESTNEY
U.S. MAGISTRATE JUDGE